IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 7, 2023

**STATE OF TENNESSEE v. MICHAEL TAYLOR**

**Appeal from the Criminal Court for Shelby County**
**No. 19-04114, C1905504    Paula L. Skahan, Judge**

———————————————————

**No. W2023-00115-CCA-R3-CD**

———————————————————

A Shelby County Grand Jury indicted the Defendant, Michael Taylor, for first degree premeditated murder, unlawful possession of a weapon, and violation of an order of protection. The Defendant, at his jury trial, was convicted of the lesser included offense of second degree murder as well as the charged offenses of unlawful possession of a weapon and violation of an order of protection. Following a sentencing hearing, the trial court imposed an effective twenty-five year sentence. On appeal, the Defendant argues the trial court provided an incomplete and misleading jury instruction on self-defense that prevented him from receiving a fair trial. Because the self-defense instruction was error and this error was not harmless beyond a reasonable doubt given the particular facts of this case, we reverse the Defendant's convictions and remand this case to the trial court for a new trial on all counts.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed and Remanded**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which JILL BARTEE AYERS and JOHN W. CAMPBELL, SR., JJ., joined.

Claiborne H. Ferguson (on appeal) and Samuel Muldavin (at trial), Memphis, Tennessee, for the appellant, Michael Taylor.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Steve Mulroy, District Attorney General; and Julie Cardillo and Theresa McCusker, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

On January 3, 2018, the Defendant violated an order of protection by possessing a firearm and going to the home of his estranged girlfriend, Pamela Smith. While at this

home, Maalik Smith, the girlfriend's adult son, confronted the Defendant at gunpoint, which resulted in the Defendant shooting Mr. Smith five times, killing him. Thereafter, the Defendant left the scene and spent the night in Mississippi before returning to Memphis the next day.

Pamela Smith, Maalik Smith's mother, testified that she and the Defendant had been in a relationship for nineteen years but were estranged at the time of her son's death. On December 13, 2017, just a couple of weeks prior to this incident, Ms. Smith obtained an order of protection, which prohibited the Defendant from contacting her in any way; from approaching her person, her residence, or her workplace; and from possessing a gun until December 13, 2018. Both Ms. Smith and the Defendant were required to sign this order of protection.

On January 3, 2018, Ms. Smith had lunch with her son, and her son later picked her up from work and dropped her off at her car. Ms. Smith told her son to go ahead to her parents' home at 5307 Annandale Drive in Memphis, where she was living, and she continued on to get some gas and to pick up a pizza. When Ms. Smith arrived home around 8:00 p.m., it was already dark outside, and there was only a dim light coming from inside the house. As she got out of her car, she heard a rustling in the area of nearby bushes, and she hurriedly headed toward the house. As she walked up the sidewalk to the home's front door, she noticed her son's lunch leftovers and his cellphone scattered on the ground. She then saw her son, who was unresponsive and lying in "a cradle position" in the bushes. Ms. Smith yelled for help, and she and her father got Maalik into the house and called 9-1-1. A detective later informed Ms. Smith that her son passed away that night.

Early the next morning, Ms. Smith was unable to sleep and went for a walk, hoping to find some evidence that the investigating officers had overlooked. As she walked toward the bushes where she had heard the rustling the night before, she discovered a glove with the Pittsburg Steelers logo, which she recognized as one of a pair of gloves she had purchased for the Defendant. Ms. Smith gave this glove to officers who were still working at the crime scene. Despite finding this glove, Ms. Smith noted that she never observed the Defendant's gray Titan truck at her parents' home the previous night. She noted that the Defendant called her phone several times earlier in the day on January 3, 2018, although she never spoke to him.

On cross-examination, Ms. Smith agreed that her parents' front yard slightly sloped down toward the sidewalk. She acknowledged that a gun was collected from her son's jacket before he was taken to the hospital.

Dr. Marco Ross, the chief medical examiner at the West Tennessee Regional Forensic Center, was accepted as an expert in the field of forensic pathology. Dr. Ross testified that Mr. Smith's autopsy showed he had received "multiple gunshot wounds," including one shot to the top of his head, one shot to his left forearm, two shots to his pelvis, and one shot to his right thigh. Mr. Smith also sustained an abrasion on the left side of his forehead. Dr. Ross stated that the gunshot wound to Mr. Smith's head "perforated his brain" and constituted "a lethal injury[.]" He noted that four bullets were collected from Mr. Smith's body during the autopsy. In addition, he said that Mr. Smith's blood tested positive for marijuana. Dr. Ross concluded that Mr. Smith's death was caused by "multiple gunshot wounds" and that his manner of death was "homicide."

Deputy Justin Hudson with the Shelby County Sheriff's Office testified that he was one of the first officers to arrive at the crime scene. Deputy Hudson said that he found "a bag of ammunition" and bullet casings near the home's porch. He also found a nine-millimeter "black Hi-[P]oint handgun" in the left pocket of Mr. Smith's jacket. When Deputy Hudson examined this gun, he noticed that the gun was "unusable" because there was an empty casing that had not yet been ejected, which prevented the next live round from being fed into the chamber. He explained that when the Hi-Point gun had been fired, the shell casing from that projectile had not been ejected.

On cross-examination, Deputy Hudson acknowledged that a casing not being ejected can be referred to as a gun jamming. He stated that if Mr. Smith's Hi-Point gun had not jammed, it would have been possible for Mr. Smith to have fired several more rounds. Deputy Hudson also noted that the serial number of the gun in Mr. Smith's pocket had been damaged, as if it had been scraped off.

Donald Savery, a friend of Ms. Smith's family, testified that he spent the night with the Smith family the night of January 3, 2018, after he was told that Ms. Smith's son had been shot. Savery went to a doctor's appointment in Memphis the next morning. As Savery was headed back home, he noticed that he was being closely followed by a man in a distinctive truck that matched the description that Ms. Smith had given him of the Defendant's truck. Savery later stopped at Walmart in Memphis between 11:00 a.m. and 12:00 p.m. on January 4, 2018, and the truck following him stopped as well. Savery entered the Walmart and eventually took a photograph of the man who followed him, which the Smith family identified as the Defendant. Savery said the Smith family then called the police to let them know that the Defendant was at the Walmart.

Lieutenant Natalie Hilliman with the Shelby County Sheriff's Department testified that she collected the Pittsburg Steelers glove from the crime scene on January 4, 2018. She also went with another detective when the cell phone belonging to the Defendant, who

was a suspect in Mr. Smith's death, "started pinging" at a Walmart in Memphis. Upon arriving at the Walmart, Lieutenant Hilliman and the other detective located the Defendant's truck in the parking lot. When the Defendant exited Walmart and began walking toward his truck, Lieutenant Hilliman and some other officers approached the Defendant and identified themselves. The Defendant started trying to "inch away" from them so he could run away, but the officers were able to take him into custody.

Detective Chase Craven with the Shelby County Sheriff's Office identified photographs of one projectile, three spent .380 shell casings, two unfired .380 bullets, a plastic bag containing six unfired .380 bullets, and a black cell phone that were collected from the crime scene. He said that officers also recovered a Hi-Point nine-millimeter semiautomatic gun that had malfunctioned from Mr. Smith's pocket. Detective Craven said that after this gun was fired, both a shell casing, which failed to be ejected, and a live round became stuck in the gun. He stated his opinion that this gun malfunctioned because Mr. Smith was trying to fire the gun from inside his jacket pocket and the "slide couldn't come back all the way[,]" which prevented the shell casing from properly ejecting and prevented the new bullet from properly loading. After the Defendant was taken into custody, Detective Craven and other officers executed a search warrant on the Defendant's apartment, where they found a holster, a box for a .380 Bersa handgun, and several Pittsburg Steelers items. He noted that when they executed a search of the Defendant's Nissan Titan truck, officers found a .380 Bersa handgun, which matched the .380 live rounds found at the crime scene; a box of Federal .380 ammunition, which matched at least one of the live .380 rounds found at the crime scene; and a duffle bag containing various clothing and a Pittsburg Steelers jersey. He stated that officers also found a substance that appeared to be blood on the driver's seat of the Defendant's truck as well as gauze and peroxide, which were consistent with wound care, inside this truck.

On cross-examination, Detective Craven acknowledged that the serial number on the .380 Bersa handgun was intact. He also stated that the Hi-Point nine-millimeter gun, which was found in Mr. Smith's pocket, had been fired at least one time. When asked if it was possible that the Hi-Point gun had been shot more than one time before it jammed, Detective Craven replied that officers collected only one spent shell casing, which was located inside the ejection port of the Hi-Point gun.

Detective George Selby with the Shelby County Sheriff's Office testified that when he arrived at the crime scene on Annandale Drive, he collected the Hi-Point handgun, the magazine that holds the ammunition, and some loose live rounds. He later transported four spent projectiles and the Bersa .380 handgun to the Tennessee Bureau of Investigation (TBI) for examination. Detective Selby also identified the pepper spray that was collected from the Defendant's person at the time he was taken into custody. Detective Selby later

- 4 -

interviewed the Defendant on January 4, 2018, and noted that the Defendant had an injury to his left upper thigh area as well as an injury to the back of the Defendant's leg, which were covered in gauze and a bandage. He said the Defendant claimed these injuries were from a gunshot wound that entered the front of his thigh and exited at the back of his upper leg.

On cross-examination, Detective Selby said he took photographs of the Defendant's wounds, which were admitted. He acknowledged that the Defendant was cooperative during his interview and answered all of his questions.

Detective Samuel Crews with the Shelby County Sheriff's Department testified that he transported to the TBI the three spent .380 shell casings, the .380 bullet, the Hi-Point handgun, and the nine-millimeter casings found at the crime scene as well as the .380 Bersa gun found at the time of the Defendant's arrest.

Kasia Lynch, a special agent forensic scientist with the TBI, was accepted as an expert in the field of firearms examinations. She stated that she received two guns, one bullet, four cartridge cases, and six live rounds as well as four bullets retrieved from Mr. Smith's body. Agent Lynch confirmed, after test firing Mr. Smith's Hi-Point nine-millimeter handgun, that this gun fired one of the cartridge cases that had been sent to her. She also confirmed that the three other cartridges cases had been fired from the Defendant's Bersa Thunder .380 automatic caliber pistol. Agent Lynch noted that the bullet she was sent had some similar marks on it, but there were not enough "to conclusively determine that the bullet had been fired in the Bersa gun." Agent Lynch also tested the four bullets that had been removed from Mr. Smith's body during the autopsy and determined that three of these bullets had been fired from the Bersa firearm. She asserted that the fourth bullet from the autopsy as well as the other bullet she had previously examined had "similar characteristics" but did not have sufficient marks for her to definitively conclude that they had been fired from the Bersa .380 handgun.

Agent Lynch also tested the jacket Mr. Smith had been wearing and concluded that the hole in the jacket's left pocket was "a contact shot," which meant that "[Mr. Smith's] gun was making contact with this part of the fabric as it fired." She said that this could have resulted in the Hi-Point gun jamming, either because "the slide's not far enough back or it's coming forward too quickly" and the cartridge case was "standing upright" instead of being ejected or because there was "a misfeed where the cartridge case [did not] come out at all, because the slide ha[d] no room to move back." She said either of these scenarios would be very likely if the gun was shot while in a tight environment such as inside a pocket. She also stated that either of these scenarios would prevent the next round from properly entering the chamber. Agent Lynch noted the hole in the left sleeve and the hole

in Mr. Smith's jacket both had lead residue, which was consistent with the passage of a bullet, but there was no gunshot residue, so she was unable to determine how far away the gun had been from the jacket when the gun was fired.

On cross-examination, Agent Lynch said she test fired the Hi-Point nine-millimeter gun in her laboratory, and it functioned properly in that setting. She said she fired this gun five or six times, and it did not malfunction. Agent Lynch acknowledged that the fact that the gun was fired inside the jacket pocket would not necessarily cause it to malfunction. She agreed that the Hi-Point gun was fired at least one time because she had one cartridge case that had been partially ejected from that gun.

Lindsey Anderson, a special agent forensic scientist at the TBI, was accepted as an expert in the field of microanalysis examination. She said that she tested Mr. Smith's jacket, toboggan, and hat as well as the pepper spray cannister found on the Defendant. When she looked at the pepper spray under a UV light, she observed florescent characteristics in it as well as the presence of "capsaicinoids, which are oily compounds naturally present in hot peppers" that are "added to chemical or commercial pepper sprays" to give them their "irritant properties." She explained that the capsaicinoids in the pepper spray will cause "burning and irritation" and cause the person exposed to "drool, get a runny nose, [and] watery eyes[.]" Agent Anderson determined that the toboggan also had florescent characteristics and the presence of the same oily compounds as in the pepper spray. She acknowledged that the pepper spray she tested was not unique because many of the commercial pepper sprays contained these capsaicinoids, although only around fifty percent of the commercial pepper sprays contained the florescent component. When she tested Mr. Smith's hat and jacket, she detected the same florescent characteristics as well as the same capsaicinoids that she found in the pepper spray and on the toboggan.

On cross-examination, Agent Anderson affirmed that the spray found on Mr. Smith's toboggan and jacket was consistent with the spray in the pepper spray cannister collected from the Defendant.

Eric Warren, who was employed with SEP Consultants in Memphis at the time of trial but had previously worked for nine years at the TBI in firearm and tool mark identification, was accepted as an expert in the field of shooting scene. He stated that Mr. Smith's jacket had indicators of a contact shot of the muzzle of Mr. Smith's gun against the jacket's pocket because the material of the jacket was pushed outward and the synthetic fibers of the jacket were starting to curl up and melt. He noted that based on the location of Mr. Smith's wounds and the location of the cartridge cases in the yard, it appeared that the Defendant could have fired his first shot to Mr. Smith's forearm while directly in front of him and then the Defendant moved to the Defendant's left and continued to fire three

subsequent shots into Mr. Smith's pelvis and thigh. Regarding the Defendant's shot to the top of Mr. Smith's head, Warren opined that because Mr. Smith also had an abrasion and bruising to his left eye and the bridge of the nose, this would be consistent with Mr. Smith sustaining the shot to his forearm and then the three shots to his pelvis and thigh before he fell down on his face and sustained the very last shot to the top of his head.

After reviewing the TBI's microanalysis report, which found that the capsaicinoid compounds on the jacket were the same as the compounds found in the pepper spray cannister, Warren opined this evidence was consistent with the Defendant pepper-spraying Mr. Smith. After taking into account the police officers' data points, the wound paths of gunshot wounds to Mr. Smith and the Defendant, and the spraying of Mr. Smith with pepper spray, he concluded that Mr. Smith fired his gun from inside his jacket pocket, which accounted for the one wound to the Defendant's thigh. Warren also concluded that the Defendant pepper-sprayed Mr. Smith, the Defendant pocketed the pepper spray and got his firearm and then fired shots to Mr. Smith's forearm, pelvis and thigh, before firing the final shot to the top Mr. Smith's head.

On cross-examination, Warren acknowledged that he had not gone to the crime scene and was basing his shooting reconstruction on the photographs of the crime scene and the information he had been given from the police investigation. He asserted that because the cartridges cases were found in the front yard, these shots were fired from the yard rather than near the home's front porch. He acknowledged that his opinion on the shooting reconstruction was simply a theory regarding what happened because he was not present when the shooting occurred. Warren said that while he could not be sure of the order of the first four shots to Mr. Smith's forearm, pelvis, and thigh, he believed that the shot to the top of Mr. Smith's head occurred last "because of the angle" of the shot and "because of the bruising" to his face. However, Warren acknowledged that he did not know how Mr. Smith was moving after sustaining each of the shots. He noted that the yard was approximately thirty-five feet deep and the yard from the front porch to the street had an "eleven percent slope." He also said that because of the angles of the shots, it would have been difficult for those angles to occur if Mr. Smith was on the ground for the first four shots, although he believed that the shot to the top of Mr. Smith's head had occurred while he was on the ground.

On redirect examination, Warren stated that after taking into account the locations of the cartridge cases in the yard, the height of the Defendant and Mr. Smith, the slope of the yard, and putting all this information into a three-dimensional diagram to scale in his computer, he believed the Defendant and Mr. Smith were eight to ten feet apart when the shots were fired.

The Defendant testified that he was a truck driver and routinely carried pepper spray and his gun while he was working. On January 3, 2018, the Defendant finished his deliveries at approximately 6:30 p.m. and grabbed his belongings out of his truck, putting his gun in his back pocket, his pepper spray in his jacket pocket, and grabbing his gloves. He went back to his apartment and packed clothing for his delivery the next day, and around 8:00 p.m., he decided to go to Ms. Smith's parents' home to see if Ms. Smith was there so he could try to reconcile with her. When he drove over there in his pickup truck, he had his gun, his pepper spray, and his gloves with him. The Defendant said he parked his truck on the corner, one house down from the Smith residence, and then walked on the sidewalk toward Ms. Smith's parents' home. When the Defendant did not see Ms. Smith's car at her parents' home, he "turn[ed] back around to get ready to go back to his pickup truck." The Defendant then stated that someone yelled at him and asked him "what the hell [he] was doing" over there. The Defendant said this yell scared him because it was very dark and he was not expecting for anyone to be there. He then saw someone "with his hand in his pocket" coming toward him. The Defendant said he did not realize that this person was Ms. Smith's son at the time.

The Defendant stated that he "immediately put [his] hands up" to show he was not going to cause trouble and began walking toward the person. The Defendant said the other man, whom he recognized as Mr. Smith as he got closer, became "angry" and asked him why he was there. He said he was scared when Mr. Smith confronted him, even though he had known the man, who was like a son to him, since he was two years old. The Defendant told Mr. Smith that he was there to see his mother, if she was home. This made Mr. Smith even angrier, and he told the Defendant that he "shouldn't be here." The Defendant repeated that he was there to see Ms. Smith, and he kept his eyes on Mr. Smith, who still had his left hand in his pocket with his hand pointed toward him. The Defendant said that every time he told Mr. Smith to calm down, he got angrier, and when he moved his left hand, the Defendant could see Mr. Smith's hand on the black butt of a gun. The Defendant stated that he knew he had to do something to escape, so he grabbed his pepper spray from his jacket pocket. He then pepper-sprayed Mr. Smith, turned around, and began running. The Defendant explained that he pepper-sprayed him because he was "try[ing] to get out of there" and "never thought about pulling out his firearm" because he was just trying to get away so he "could live." As the Defendant was running away, he heard a loud noise and realized he had been shot. The Defendant said he felt "scared for [his] life" and thought he was "going to die" after Mr. Smith shot him. He said that the "only thing [he] could do was defend [him]self." The Defendant grabbed his gun from his right back pocket and returned fire at Mr. Smith, firing approximately three shots. He said that only one or two seconds elapsed from when he first saw the gun to Mr. Smith's shooting him.

- 8 -

After the Defendant fired his shots, he ran between the Smith home and the neighbor's house and headed toward his truck, which was parked "the next street over" and "was facing west." He said that once he got to his truck, he jumped in and cranked it, made a right turn, and started driving north. The Defendant said he was "distraught" and his "emotions [were] running everywhere." He said that he never intended "for this to happen," and ended up driving to Holly Springs, Mississippi, where he checked into a hotel. He put his gun in his previously packed duffle bag and left the duffle bag in his pick-up truck. The Defendant said he did not take his bag into the hotel room because he had just been shot and had just shot someone and was "not thinking clearly." He tied a towel around his leg injury to stop the bleeding. The next morning, the Defendant drove back home to Memphis, so he could call some lawyers and turn himself in. He arrived home around 7:00 a.m. and attempted to call some attorneys. After that, the Defendant went to a nearby Walmart to purchase peroxide and gauze so he could treat his gunshot wound.

The Defendant insisted that he did not know Donald Savery and that he saw Savery for the first time when Savery testified at this trial. He denied following Savery on January 4, 2018, and claimed he had gone to Walmart to get gauze and pick up his prescription. He said he dropped off his prescription at the pharmacy, and while he was waiting for it to be ready, he walked around the Walmart to get a prescription filled and to find peroxide and gauze for his gunshot wound. He checked out with these items and then went to the pharmacy to pick up his medicine. The Defendant returned to his truck, where he put peroxide and gauze on his wounds. A few minutes later, a man in plain clothes approached his truck and asked the Defendant if he was Michael Taylor. When a couple more men appeared, the Defendant started backing up because these men did not identify themselves as police officers. The Defendant said these men handcuffed him and brought him to jail to be booked.

On cross-examination, the Defendant claimed that he did not initially realize that the person yelling at him at the Smith residence that night was Mr. Smith, even though he had known him for nineteen years. While the Defendant acknowledged that he shot Mr. Smith five times, he claimed he shot him in self-defense. The Defendant admitted that after firing these shots, he drove away from the scene and did not call 9-1-1. The Defendant also admitted that he had gone to the Smith residence and had parked at the corner rather than in front of the house. The Defendant acknowledged that he went to a hotel in Holly Springs, Mississippi after the shooting, that he never went to a doctor or hospital for his gunshot wound, and that he never reported the incident or turned himself into the police. The Defendant said he knew Ms. Smith had an order of protection against him because he was present at the hearing when the order of protection was granted and because he had signed the order of protection. The Defendant acknowledged that he was required by law to stay away from Ms. Smith, as well as her residence and workplace, and that he was

prohibited from possessing a gun. The Defendant admitted that he violated the law on January 3, 2018, by going to Ms. Smith's residence and by possessing a gun. Although the Defendant claimed he loved Mr. Smith like a son, he admitted that he never called 9-1-1 after he shot him five times.

At the conclusion of trial, the Defendant was convicted of the lesser included offense of second degree murder as well as the charged offenses of unlawful possession of a weapon and violation of an order of protection. The trial court then imposed an effective twenty-five year sentence.

Thereafter, the Defendant filed a timely motion for new trial, alleging in pertinent part that the trial court "improperly declined to instruct the jury regarding the duty to retreat, thereby denying the jury the opportunity to fairly consider defendant's claim of self-defense[.]" After the trial court denied the motion for new trial, the Defendant timely filed a notice of appeal.

## **ANALYSIS**

The Defendant argues that the trial court provided an "incomplete and misleading" instruction on self-defense that impaired his right to a fair trial. He insists that because the trial court provided a self-defense instruction that made no reference to the duty to retreat and inadvertently suggested that the triggering conditions for the duty to retreat—namely engaging in unlawful activity or being in a place where he did not have a right to be—were a complete bar to asserting a claim of self-defense, the jury never received a complete and accurate instruction on self-defense. The Defendant also asserts that although he openly admitted to facts that imposed on him a duty to retreat before he could lawfully act in self-defense, the trial court fell short of satisfying its duty to provide jury instructions on issues fundamental to his defense and essential to a fair trial. The Defendant contends that the trial court's self-defense instruction was not harmless error because it "undercut the heart of [his] sole theory of defense." Consequently, the Defendant asks this court to reverse his convictions and remand his case for a new trial.

In response, the State contends that because the trial court followed the appropriate procedure and determined that the Defendant was engaged in unlawful activity, the court was not required to instruct the jury that the defendant had no duty to retreat, and the charge on self-defense correctly stated the law. It asserts that the self-defense statute focuses on when a defendant has "no duty to retreat" and that State v. Perrier, 536 S.W.3d 388 (Tenn. 2017), focuses on whether a jury instruction should include or omit the provision that "a defendant did not have a duty to retreat." The State insists that "[t]he law does not mandate an instruction that a defendant could have an affirmative duty to retreat," and that the

- 10 -

absence of such language "does not make the jury instruction incomplete or misleading." Alternatively, the State maintains that even if this court were to conclude that the self-defense instruction should have included the additional language regarding the duty to retreat requested by the Defendant, relief is not warranted because any such error was "harmless" as such an instruction would not have changed the outcome of the Defendant's case. See State v. Faulkner, 154 S.W.3d 48, 58-60 (Tenn. 2005) (applying the harmless error standard for non-constitutional errors after concluding that the trial court's instructional error in including nature-of-conduct language in its definition of "intentionally" element of first degree premeditated murder, which is a result-of-conduct offense, was not an error of constitutional dimension).

To buttress its claim that the self-defense instruction was not erroneous, the State maintains that the Defendant admitted that he was engaged in unlawful activity and was not in a place where he had a right to be, that the proof showed that the Defendant did not retreat before murdering Mr. Smith, and that the Defendant admitted that he pepper-sprayed Mr. Smith before Mr. Smith used any force against the Defendant at all. The State also asserts that the Defendant never challenged the provocation portion of the self-defense instruction, which states that the "use of force against the deceased would not have been justified if the Defendant provoked the deceased's use of unlawful force." The State argues that even if the self-defense instruction should have included the affirmative duty to retreat, "no reasonable jury would have accepted the [D]efendant's self-defense theory." Perrier, 536 S.W.3d at 404-05 (concluding that the erroneous self-defense instruction "was harmless beyond a reasonable doubt because no reasonable jury would have accepted the defendant's self-defense theory" given that multiple witnesses testified that only words had been exchanged and that no one had used or attempted to use unlawful force on the defendant (footnote omitted)).

During trial, the Defendant filed a motion for a special jury instruction on self-defense. During a jury-out hearing immediately prior to the Defendant's testimony at trial, defense counsel referenced this motion, which specifically requested the following instruction on self-defense:

> Included in the defendant's plea of not guilty is his plea of self-defense.

> If a defendant was in a place where he or she had a right to be, he or she would have a right to use force against the deceased when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the alleged victim's use of unlawful force.

- 11 -

If a defendant was in a place where he or she had a right to be, he would also have a right to use force intended or likely to cause death or serious bodily injury, if the defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real, or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds.

If a defendant was in a place where he or she did not have a right to be, he or she would have a right to use force against the deceased when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the alleged victim's use of unlawful force. However, the defendant would first have a duty to retreat and must have employed all means in his or her power, consistent with his or her own safety, to avoid danger and avert the necessity of taking another's life.

If a defendant was in a place he or she did not have a right to be, he would also have a right to use force intended or likely to cause death or serious bodily injury, if the defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real, or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds. However, again, the defendant would first have a duty to retreat and must have employed all means in his or her power, consistent with his or her own safety, to avoid danger and avert the necessity of taking another's life.

In determining whether the defendant's use of force in defending himself was reasonable, you may consider not only his use of force but also all the facts and circumstances surrounding and leading up to it.

State v. Perrier, 536 S.W.3d 388, 399 (Tenn. 2017).

At this hearing, defense counsel argued that the aforementioned instruction was "essential[ly] identical" to the trial court's proposed self-defense instruction, except defense counsel's instruction added "two paragraphs" stating that if the Defendant was in a place where he was not supposed to be, then the Defendant would first have a duty to retreat before using force intended or likely to cause death or serious bodily injury. Defense counsel stated that he was requesting these two paragraphs because "simply saying if the defendant was in a place where he . . . or she had a right to be, [then] he or she would have

- 12 -

a right to defend . . . suggests that if the individual was in a place where he [did] not have [a right] to be, [then] he does not have a right to self-defense," which is "contrary to what the Perrier case says . . . ."

In response, the prosecutor argued that Perrier addressed "the unlawful activity part of the self-defense [instruction] and held that the trial court would need to have the out[-]of[-]jury hearing to make the determination if there was unlawful activity" based on the proof. The prosecutor then stated that if the trial court determined that the defendant was engaged in unlawful activity at the time he used force, then the defendant "would have a duty to retreat." However, she asserted that Perrier never addressed the defendant being in a "place where he shouldn't be." The State noted that the Perrier case did not set forth "what the instructions should be" but it "refer[red] back to the common law of self-defense," which was "the language the defense ha[d] put into [its] proposed instruction." Significantly, the prosecutor said that the State was "not opposing" the defense's proposed instruction because "it's an accurate classification of what the law is on self-defense at this time." Although the prosecutor could not find "any case that said this is what the instruction should be," the defense's proposed instruction was "consistent with the case law and the reference back to common law." The prosecutor added that the trial court's provocation paragraph should also be included in the self-defense instruction.

The trial court then stated:

So as far as whether or not [the Defendant] was in a place where he had a right to be, I do find he was engaged in unlawful activity, clearly, [because] there was an order of protection in place clearly stating he was not . . . allowed to be around Ms. Smith, any place where she was likely to be, and certainly was not allowed to have a gun. So based on the proof that I have heard so far and what I expect to hear from [the Defendant]'s testimony, I do find he was . . . engaged in unlawful activity.

The trial court then asked if both parties had looked at the "newest Tennessee pattern[] jury instruction from September 2021, section 40.06 self-defense[.]" The court noted that there was a bracketed portion of the pattern instruction, which said to remove certain language from the instruction if the trial court found that the defendant was engaged in unlawful activity, which is why it removed the language regarding no duty to retreat from the instruction in this case. The trial court then noted, "I guess the question is whether to add the language that the defendant [in this case] did have a duty to retreat." The court reviewed defense counsel's proposed instruction and observed that the "extra language" was "not part of the pattern[] jury instruction[,]" which meant the court was not obligated to give it. The trial court stated that it was going to take it under advisement until the

- 13 -

Defendant testified at trial. It then asked the prosecutor if it was the position of the State to give defense counsel's proposed instruction, and the State replied:

> Well, Your Honor, . . . it is quite the quandary[,] I agree with the Court, because . . . there is no case law to tell us one way or the other. The case law tells us up to the point where Your Honor has just stated, but . . . there is no case law to say [the duty to retreat language] should be added or it should not. I do believe [defense counsel's] language is consistent with the things that <u>Perrier</u> said. However, [<u>Perrier</u>] does not go to that step to say that this should be included in the jury instruction[] [for self-defense].

After the Defendant testified at trial and the jury was excused, the trial court informed the parties that it was not going to give defense counsel's proposed jury instruction on self-defense because that instruction went "beyond what the law requires." Thereafter, the trial court provided the following instruction on self-defense during its jury charge, which closely follows the pattern jury instruction for self-defense:

### Defense: Self-Defense

> Included in the defendant's plea of not guilty is his plea of self-defense.

> If a defendant was in a place where he or she had a right to be, he or she would have a right to use force against the deceased when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the alleged victim's use of unlawful force.

> In determining whether the defendant's use of force in defending himself was reasonable, you may consider not only his use of force but also all the facts and circumstances surrounding and leading up to it.

> If a defendant was in a place where he or she had a right to be, he would also have a right to use force intended or likely to cause death or serious bodily injury[] if the defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real, or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds.

- 14 -

The use of force against the deceased would not have been justified if the defendant provoked the deceased's use of unlawful force, unless the defendant abandoned the encounter or clearly communicated to the deceased the intent to do so, and the deceased nevertheless continued to use unlawful force against the defendant.

**"Force"** means compulsion by the use of physical power or violence.

**"Violence"** means evidence of physical force unlawfully exercised so as to damage, injure or abuse. Physical contact is not required to prove violence. Unlawfully pointing a deadly weapon at an alleged victim is physical force directed toward the body of the victim.

**"Imminent"** means near at hand; on the point of happening.

**"Serious bodily injury"** means bodily injury that involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty.

The burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense.

To convict the defendant, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. If from all the facts and circumstances you find the defendant acted in self-defense, or if you have a reasonable doubt as to whether the defendant acted in self-defense, you must find him not guilty.

Cf. 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 40.06(b).

At the hearing on the motion for new trial, defense counsel argued:

Nowhere in the jury instruction [provided by the trial court for self-defense] is there any mention of a duty to retreat. And that is critical, Your Honor, because as it is written, the instruction essentially tells the jury that if a person is not in a place where he has a right to be or if he is engaged in unlawful conduct, he does not have a right to self-defense.

- 15 -

That is contrary to the language of the self-defense statute, which mentions [a] duty to retreat and says that if a person is in a place where he has a right to be, he has no duty to retreat. It is silent, the statute is silent with regard to when we have a person who is not in [a] place where he has a right to be or is engaged in unlawful conduct.

But I respectfully suggest to the Court that the logical inference from that would be that if a person is in a place where he does not have a right to be or is engaged in . . . unlawful conduct, he does in fact . . . have a duty to retreat. But nevertheless, [he] has a right to defend himself if the circumstances lend themselves to that.

State [v.] Perrier held that [the] legislature intend[ed] that the phrase no[t] engaged in lawful activity in the self[-]defense statute to be a condition on the statutory privilege not to retreat. The logical inference from that is that engag[ing] in unlawful conduct would void the statutory right not to retreat, but nevertheless would still provide the defendant with a right to self[-]defense.

Quoting from page 104 of Perrier, thus a duty to retreat does not mean that a person cannot defend herself or himself. A defendant may defend himself even to the point of using deadly force.

The language of the jury instruction as it was presented to the jury suggested to that jury that because [the Defendant] was not in a place where he had a right to be and because he was engaged in unlawful conduct, he simply did not have a right to self[-]defense. And that is simply not the law as stated by Perrier. I believe the jury instruction as such was misleading and led the jury to believe that they had no choice but to . . . forego consideration of self[-]defense in determining this matter.

In response, the State argued that while Perrier held that there was no duty to retreat "when the person was not engaged in unlawful activity or was in a place where they did have a right to be," Perrier "did not address a situation where . . . the person was both engaged in unlawful activity and did not have a right to be there." The State added that Perrier "was silent on that issue" and that defense counsel was "inferring from the silence his position." The State then noted:

The [self-defense] statute doesn't address it either[,] but one could just as easily infer the opposite[,] that because it was silent on the issue, both the

- 16 -

statute and the [Perrier] case, that it should not be charged since [the Defendant] was both in a place where he didn't have a right to be [and] was engaged in conduct that he shouldn't have been doing [because] there was a current order of protection [that] protect[ed] the mom of the victim.

The State also contended that "the self-defense instruction [given by the trial court] stated that the use of force against the deceased would not have been justified if the defendant provoked the deceased's use of unlawful force." It noted that at trial it argued that "the victim was defending himself against the [D]efendant because the [D]efendant first maced [the victim] before anything else happened, according to the [D]efendant, although there were no other witnesses on the scene besides the [D]efendant and the victim." The State asserted that the proof showed that "there was mace on the victim's clothing" and "the jury obviously took that into account" because anything the victim did was "in response to the [Defendant's] spraying of the mace on him." After listening to both parties' arguments, the trial court noted that "we had extensive discussion about this during the trial" and that this would be "part of [the Defendant's] appeal in this case" but that the issue was "overruled."

In considering this issue, we initially note that a criminal defendant has "'a constitutional right to complete and accurate jury instructions on the law, and the trial court's failure to provide complete and accurate jury instructions deprives a defendant of the constitutional right to a jury trial.'" State v. Cole-Pugh, 588 S.W.3d 254, 260 (Tenn. 2019) (quoting Cauthern v. State, 145 S.W.3d 571, 600 (Tenn. Crim. App. 2004)). "In criminal cases, a trial court's duty to accurately instruct the jury on relevant legal principles exists without request." State v. Benson, 600 S.W.3d 896, 902 (Tenn. 2020) (citing State v. Hawkins, 406 S.W.3d 121, 129 (Tenn. 2013)). "This obligation extends to general defenses, such as self-defense, defense of another, or defense of a habitation." Hawkins, 406 S.W.3d at 129. "'[T]he defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge.'" State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001) (quoting State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975)). "[A] trial court's jury charge 'should not contain inaccurate or inapplicable statements of legal principles that might tend to confuse the jury.'" State v. Hatcher, 310 S.W.3d 788, 812 (Tenn. 2010) (quoting Troup v. Fischer Steel Corp., 236 S.W.3d 143, 149 (Tenn. 2007)).

We note that "'pattern jury instructions are not entitled to any particular deference.'" State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting State v. Rimmer, 250 S.W.3d 12, 30 (Tenn. 2008)). Moreover, "[t]rial courts are not limited to the mere recitation of the pattern instructions." Id. The Tennessee Supreme Court has made clear that "[p]attern jury instructions are not officially approved by this Court or by the General Assembly and

should be used only after careful analysis. They are merely patterns or suggestions." State v. Hodges, 944 S.W.2d 346, 354 (Tenn. 1997). As applicable here, a trial court's refusal to charge a jury with a special instruction "will only be considered error if the general charge did not fully and fairly state the applicable law." Benson, 600 S.W.3d at 903 (citing Hawkins, 406 S.W.3d at 129).

Because questions involving the propriety of jury instructions are mixed questions of law and fact, the standard of review is de novo with no presumption of correctness. Cole-Pugh, 588 S.W.3d at 259-60 (citing Perrier, 536 S.W.3d at 396). An instruction is "'prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law.'" Perrier, 536 S.W.3d at 403 (quoting Faulkner, 154 S.W.3d at 58).

A trial court need not submit "[t]he issue of the existence of a defense . . . to the jury unless it is fairly raised by the proof." Tenn. Code Ann. § 39-11-203(c); Benson, 600 S.W.3d at 904; Hawkins, 406 S.W.3d at 129. However, "[t]he defendant has the burden of introducing admissible evidence that a defense is applicable." Tenn. Code Ann. § 39-11-203, Sentencing Comm'n Cmts. The Tennessee Supreme Court held that self-defense is a "general defense" and that "the quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence." Hawkins, 406 S.W.3d at 129; see Perrier, 536 S.W.3d at 403. "When determining if a defense has been fairly raised by the proof, the court must consider the evidence in the light most favorable to the defendant, including all reasonable inferences that can be made in the defendant's favor." Benson, 600 S.W.3d at 903 (citing Hawkins, 406 S.W.3d at 129). When admissible evidence fairly raises a general defense, the trial court must submit the general defense to the jury, and at that point the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply. Hawkins, 406 S.W.3d at 129; see Perrier, 536 S.W.3d at 403.

At the time of the offenses in this case, Tennessee Code Annotated section 39-11-611(b), which outlines self-defense, provided the following:

(1) Notwithstanding § 39-17-1322,[1] a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to

---

[1] Tennessee Code Annotated section 39-17-1322 (Supp. 2017) provides a defense to prosecution for a weapons violation "if a person possessed, displayed or employed a handgun in justifiable self-defense . . . ."

- 18 -

the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;[2]

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b) (Supp. 2017).

Prior to 1989, self-defense was a matter of common law that included the duty to retreat before a person could take another's life in self-defense. Perrier, 536 S.W.3d at 397. However, in 1989, the legislature codified the law on self-defense and eliminated the duty to retreat before a person threatened or used force in self-defense. Id. (citing Tenn. Code Ann. § 39-11-611(a)). In 2007, the legislature rewrote the self-defense statute, eliminating the duty to retreat both before a person threatened or used force and before a person threatened or used force intended or likely to cause death or serious bodily injury if the person was not engaged in unlawful activity and in a place where the person had a right to be. Id. (citing Tenn. Code Ann. § 39-11-611(b) (2007)).

In Perrier, 536 S.W.3d at 399, the Tennessee Supreme Court concluded that a defendant's "unlawful activity," as determined by the trial court, applies only to a defendant's "duty to retreat," not to whether the defendant is entitled to threaten or use force in self-defense. The court noted that the language in the current form of the self-defense statute, namely "the person . . . is in a place where the person has a right to be," related to the "true man" doctrine, otherwise known as the "no-duty-to-retreat rule" in Renner, which applied "'only (1) when the defendant is without fault in provoking the

---

[2] "Serious bodily injury" is defined as "bodily injury" involving "(A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or (F) A broken bone of a child who is twelve (12) years of age or less[.]" Tenn. Code Ann. § 39-11-106(a)(34) (2018).

- 19 -

confrontation, and (2) when the defendant is in a place where he has a lawful right to be and is there placed in reasonably apparent danger of imminent bodily harm or death.'" Id. (quoting State v. Renner, 912 S.W.2d 701, 704 (Tenn. 1995)). After observing that the provocation factor was codified in Code section 39-11-611(e)(2) and the phrase "is in a place where the person has a right to be" was codified in Code section 39-11-611(b), the court held that "[t]he relationship between [the defendant being "in a place where he has a right to be"] and the 'true man'/no-duty-to-retreat rule lends credence to the defendant's argument that the 'not engaged in unlawful activity' language only applies to whether a duty to retreat exists." Id. After considering the presumption in Code section 39-11-611(c) and the "unlawful activity" exception to this presumption in Code section 39-11-611(d)(3), the Perrier court reached the following conclusion:

> Interpreting "not engaged in unlawful activity" as used in subsections (b)(1) and (b)(2) as a condition on the privilege to not retreat is consistent with the way "engaged in an unlawful activity" [in subsection (d)(3)] is used as a limitation on the subsection (c) presumption [that a person using defensive force in a residence/business/dwelling/vehicle "is presumed to have held a reasonable belief of imminent death or serious bodily injury" when the defensive force is used against someone "who unlawfully and forcibly enter[ed]" said building or vehicle]. Therefore, taking into consideration the history of the statute, the developments in case law as connected to the principles espoused in the statute, and the language of the statute as a whole, we conclude that the phrase "engaged in unlawful activity" applies only to a person's duty to retreat.

Id. (emphasis added). After considering similar self-defense statutes in several other states, the court then held:

> Consistent with our holding that the phrase "not engaged in unlawful activity" is a condition on a person's statutory privilege not to retreat, we hold that a person is entitled to a jury instruction that he or she did not have to retreat from an alleged attack only when the person was not engaged in unlawful activity and was in a place the person had a right to be.

Id. at 401.

The Perrier court then concluded that "the trial court makes the threshold determination whether to charge the jury with self-defense" and that "the trial court, as part of that threshold determination, should decide whether to charge the jury that a defendant did not have a duty to retreat." Id. at 403. When determining whether to instruct the jury

- 20 -

that the defendant did not have a duty to retreat, "the trial court should consider whether the State has produced clear and convincing evidence that the defendant was engaged in unlawful activity such that the 'no duty to retreat' instruction would not apply." Id. The court recognized that "[b]ecause the allegedly unlawful activity will oftentimes be uncharged conduct similar to evidence of prior bad acts, the procedure outlined in Tennessee Rule of Evidence 404(b) should be utilized by the parties." Id. After determining that Perrier's possession of a firearm as a convicted felon amounted to "engaging in unlawful activity," the court held that Perrier had a duty to retreat under the self-defense statute before threatening or using force. Id. at 404. The court emphasized that a duty to retreat does not mean that an individual cannot defend himself, recognizing that "[a] defendant may still defend himself even to the point of using deadly force, and as Code section 39-17-1322 makes clear, may be acquitted of a weapons offense if a jury finds that his self-defense was justifiable." Id.

The court then held that the jury instructions in Perrier's case were erroneous because they allowed the jury, rather than the trial court, to determine whether the defendant was engaged in unlawful activity for the purpose of the self-defense statute. Id. Nevertheless, the court concluded that the erroneous self-defense instruction "was harmless beyond a reasonable doubt because no reasonable jury would have accepted the defendant's self-defense theory." Id. at 404-05. The court reiterated that "'[i]n order to determine whether an instructional error is harmless, the appellate court must ask whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Id. at 404 n.8 (quoting State v. Cecil, 409 S.W.3d 599, 610 (Tenn. 2013) (internal quotation marks and citations omitted)). Significantly, the court found that any belief on the defendant's part that he was in imminent danger of death or serious bodily injury was not reasonable, given that several witnesses had testified at trial that "only words had been exchanged" and that "no one had used or attempted to use unlawful force on [Perrier]." Id. at 405.

Following the issuance of the Perrier opinion, the Tennessee Pattern Jury Instruction for self-defense was modified in an effort to comply with Perrier. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 40.06(b). Pursuant to this pattern instruction, if the trial court determines that the defendant, for offenses committed prior to July 1, 2021, was not engaged in "unlawful activity," then the court must omit the portion of the instruction that states, "The defendant would also have no duty to retreat before [threatening][using] force." Id. However, the pattern instruction notably does not include the inverse statement, that if the trial court finds that the defendant was engaged in unlawful activity, then the defendant still has a right to self-defense but has a duty to retreat before threatening or using force. See id. (emphases added).

- 21 -

We reiterate that even if the trial court determines that a defendant was engaged in "unlawful activity," the trial court must still instruct the jury on self-defense so long as it is fairly raised by the evidence. Perrier, 536 S.W.3d at 399. This is because engaging in "unlawful activity" triggers a defendant's duty to retreat but does not affect a defendant's right to threaten or to use force in self-defense. Id.; State v. Chambers, No. M2019-00694-CCA-R3-CD, 2020 WL 1493940, at *16 (Tenn. Crim. App. Mar. 26, 2020).

The Defendant asserts that because the "unlawful activity" clause and the "rightful place" clause share the same position and role in Code section 39-11-611(b)(2), they must both apply to the duty to retreat. He also argues that based on the principles of statutory construction, any other interpretation "would yield an absurd result." Sims, 45 S.W.3d at 11; State v. Fleming, 19 S.W.3d 195, 197 (Tenn. 2000). The Defendant adds that because Perrier clarified the effect and role of the "unlawful activity" clause, treating the "rightful place" clause any differently from the "unlawful activity" clause would unduly alter the statute's coverage and meaning and would be contrary to the legislative intent.

In accordance with this reasoning, the Defendant asserts that "[t]he following set of premises would form a complete, correct jury instruction on self-defense":

1. If and only if [the] defendant was (1) in a place where he or she had a right to be; and (2) not engaged in unlawful activity, then the defendant would have no duty to retreat before employing reasonable force in self-defense.

2. The Court finds that [the defendant] was engaged in unlawful activity [so, the condition in Premise 1 was not met].

3. Therefore, [the defendant] had a duty to retreat.

4. If [the defendant] satisfied his duty to retreat before employing force, then he would have a right to use reasonable force to defend himself.

5. If [the defendant] did not satisfy his duty to retreat before employing force, then he would not have a right to use force to defend himself.

The Defendant asserts that the "two conditions presented in lines 4 and 5" would "be a question decided by the jury as to whether [the defendant] had a duty to retreat before defending himself." He adds that "[t]he jury would also have to make a factual

- 22 -

determination on whether [the defendant] acted in self-defense and used reasonable force." The Defendant contends that the instruction given by the trial court failed to address whether he complied with his duty to retreat before using lethal force in self-defense (in other words, if the jury found that the Defendant did not retreat before employing force, then his self-defense argument would be foreclosed; however, if the jury found that the Defendant did retreat before employing force, then the Defendant's claim of self-defense "would be viable" and "the jury could make a finding in his favor that he acted in self-defense.").

The Defendant insists that the jury was only instructed that if he was somewhere he had a right to be, then he would have a right to use reasonable force in self-defense, which leads the "average rational juror" to conclude that if the defendant was not somewhere he has a right to be, then he does not have a right to use reasonable force in self-defense. He claims that "this misinterpretation is the most sensible conclusion for a juror to reach given the incomplete instruction of self-defense law they were provided."

The Defendant also asserts the trial court's erroneous self-defense instruction ensured that the jury was never told that the Defendant had the right to lawfully defend himself, so long as he first complied with his duty to retreat. He claims the instruction given only addressed the applicability of self-defense when someone is (1) in a place they have a right to be and (2) not engaged in illegal activity, which are circumstances under which there would be no duty to retreat. The Defendant claims that the pattern jury instruction on self-defense, which was given in his case, "counterintuitively suggest[s] that trial courts should instruct on a duty to retreat when it does not exist and [it] remain[s] silent when the duty to retreat actually arises." The Defendant claims he admitted to visiting the home of Ms. Smith and possessing a firearm, which violated the order of protection issued against him for the benefit of Ms. Smith. He asserts that because he never contested the fact that he was not in a "rightful place" or that he was engaged in an "unlawful activity," the trial court's omission of law regarding the duty to retreat was not harmless error.

On the other hand, the State claims the self-defense instruction correctly stated the law but if this instruction was error, "any such error was certainly harmless." See Faulkner, 154 S.W.3d at 58-60. Specifically, the State asserts that even if the self-defense instruction should have mentioned an affirmative duty to retreat, "no reasonable jury would have accepted the [D]efendant's self-defense theory." Perrier, 536 S.W.3d at 404-05. As support, the State argues that the Defendant admitted he was engaged in unlawful activity and was not in a place where he had a right to be at the time of the offenses, that the proof showed that the Defendant did not retreat before murdering Mr. Smith, and that the Defendant admitted that he pepper-sprayed Mr. Smith before Mr. Smith used any force at

all against the Defendant. The State also contends that the Defendant did not challenge the portion of the instruction stating that the "use of force against the deceased would not have been justified if the Defendant provoked the deceased's use of unlawful force."

We conclude that the error in this case qualified as a non-structural constitutional error[3] because the instruction violated the Defendant's right to a jury trial by failing to inform the jury that the Defendant had a right to self-defense so long as he first fulfilled his duty to retreat. See Cole-Pugh, 588 S.W.3d at 260 (stating that a criminal defendant has "a constitutional right to complete and accurate jury instructions on the law, and the trial court's failure to provide complete and accurate jury instructions deprives a defendant of the constitutional right to a jury trial." (internal quotation marks and citation omitted)); see also Perrier, 536 S.W.3d at 404-05 (concluding that the error in the self-defense instruction was "harmless beyond a reasonable doubt because no reasonable jury would have accepted the defendant's self-defense theory"). Notably, the State has the burden of showing that a non-structural constitutional error is harmless. State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). Specifically, "[t]he existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless." Id. (emphasis added). "'In order to determine whether an instructional error is harmless, the appellate court must ask whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Perrier, 536 S.W.3d at 404 n.8 (quoting Cecil, 409 S.W.3d at 610); see Neder v. United States, 527 U.S. 1, 15 (1999) (stating that the test for determining whether a non-structural constitutional error is harmless is "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (internal quotation marks and citations omitted)). As the Perrier court noted, an instructional error is harmless beyond a reasonable doubt if "no reasonable jury would have accepted the defendant's self-defense theory." Perrier, 536 S.W.3d at 404-05. When determining whether an error is harmless beyond a reasonable doubt, "a reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." State v. Allen, 69 S.W.3d 181, 191 (Tenn. 2002).

We recognize that "[a] harmless error analysis is necessarily imprecise, requiring that appellate courts assess the cold, written record rather than seeing and hearing the witnesses firsthand." Cecil, 409 S.W.3d at 611. Given these limitations, we cannot

---

[3] A non-structural constitutional error "requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless." Rodriguez, 254 S.W.3d at 371 (emphasis added). However, structural constitutional errors "require automatic reversal when they occur"; examples of structural constitutional errors include "the complete denial of the right to counsel, racial discrimination in the selection of a grand jury, denial of the right of self-representation at trial, and denial of the right to a trial by jury." Id.

conclude that the erroneous self-defense instruction in this case was harmless beyond a reasonable doubt. See id. The Defendant testified that Mr. Smith held him at gunpoint, prompting the Defendant to pepper-spray Mr. Smith in order to escape, and that Mr. Smith shot the Defendant in the leg as he was trying to escape.

In support of his claim that the self-defense instruction in this case was not harmless beyond a reasonable doubt, the Defendant argues that his conduct satisfied the duty to retreat. Noting that Perrier relied on the reasoning in State v. McCray, 512 S.W.2d 263, 265 (Tenn. 1974), the Defendant asserts that the duty to retreat requires employment of all practicable means consistent with one's own safety, which is precisely the course of action that he undertook before employing deadly force in this case. He claims that when he realized Mr. Smith was pointing a handgun at him, he sprayed him with pepper spray rather than employing his own firearm. The Defendant claims his use of the pepper spray was a "clear attempt to subdue, or at least delay, [Mr. Smith's] impending threat" to the Defendant's life with a "non-lethal deterrent" and demonstrates that his intention was "not to kill[,]" which he claims is precisely what is required for the duty to retreat. The Defendant additionally asserts that the State failed to provide any plausible reason for why he would have first pepper-sprayed Mr. Smith, if his intent was to kill him, rather than to escape from life-threatening danger[.]"

We agree with the Defendant that the duty to retreat requires a defendant to have employed all reasonable means, consistent with his own safety, before threatening or using force in self-defense. Perrier specifically noted that the common law duty to retreat required "that the slayer must have employed all means in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life." Perrier, 536 S.W.3d at 404 (citing McCray, 512 S.W.2d at 265). This court has upheld many of the special self-defense instructions that reference language similar to the common law duty to retreat. See State v. Murphy, 676 S.W.3d 91, 103 (Tenn. Crim. App. May 1, 2023) (concluding that the following language added to the self-defense instruction was a correct statement of the law: "In this case, the law of self-defense requires the defendant to have employed all means reasonably in his power, consistent with his own safety, to avoid danger and to avert the necessity of taking another's life. This requirement includes the duty to retreat in this case, if, and to the extent, it can be done in safety."); State v. Newson, No. M2021-00444-CCA-R3-CD, 2022 WL 2251303, at *10 (Tenn. June 23, 2022), perm. app. denied (Tenn. Nov. 16, 2022) (concluding that the following additional language was a correct statement of the law under the facts of that case: "The defendant had a duty to retreat before using deadly force. A duty to retreat means he was obligated to employ all means in is power, consistent with his own safety, to avoid danger and to avert the necessity of taking the alleged victim's life."); State v. Foster, No. E2020-00304-CCA-R3-CD 2021 WL 3087278, at *21 (Tenn. Crim. App. July 22, 2021) (concluding that the trial court

properly instructed the jury that "[t]he defendant had a duty to retreat before using force against the deceased," that "[t]he law of self-defense requires that the defendant must have employed all means reasonably in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life," and that "[t]his requirement includes the duty to retreat, if, and to the extent, that it can be done in safety.").

The Defendant also argues that the strongest evidence that he fulfilled his duty to retreat was the proof showing that he sustained a gunshot wound from Mr. Smith. He claims Mr. Smith shot and struck him with a single round before Smith's handgun malfunctioned, noting that Mr. Smith's "[f]iring his weapon from within his pocket jammed the action of the [Smith's] weapon" and prevented him from continuing to fire shots at the Defendant. The Defendant also contends that expert testimony at trial established that the angle of the entry wound to the Defendant's thigh showed that he was shot by Mr. Smith, who was standing at a higher elevation than the Defendant. The Defendant argues that the angle at which the bullet entered his leg, along with the location of the entry wound at his thigh and the exit wound at his rear, establishes (1) that he was "no longer near the [Smith] residence and [was] in close proximity to the street," (2) that he was "not directly facing nor confronting [Mr. Smith] at the time at which [Mr. Smith] shot him"; and (3) that he was "at a f[a]rther distance away from the [Mr. Smith] than when [the Defendant] deployed his pepper spray." The Defendant claims that all these facts, when considered together, show that he complied with his duty to retreat at the time he fired his weapon.

The Defendant testified at trial that he approached the Smith home, but when he saw that Ms. Smith's car was not parked there, he turned around and was headed back to his truck when he heard a man's voice angrily asking him why he was there. The Defendant approached this man with his hands up, eventually realizing that the person who had yelled at him was Mr. Smith. The Defendant said Mr. Smith would not calm down and was holding a gun, inside his jacket pocket, aimed at him. The Defendant asserted that he feared for his life at the time and that he sprayed Mr. Smith with pepper spray in order to escape. As the Defendant was retreating, Mr. Smith shot him in the leg, which prompted the Defendant to fire several shots at Mr. Smith.

We agree that the evidence, while not overwhelming, does show that Mr. Smith shot the Defendant a single time before Mr. Smith's handgun jammed, likely because it was fired from inside his jacket pocket. We also agree that the malfunctioning of Smith's gun prevented him from firing additional shots at the Defendant. While we do not find the Defendant's claims about the angle of his wounds persuasive, the evidence could be interpreted to suggest that the Defendant pepper-sprayed Mr. Smith in order to escape being held at gunpoint, that the Defendant was attempting to leave the Smith's property

- 26 -

when he received the gunshot wound to his leg, and that the Defendant received this gunshot wound before he returned fire at Mr. Smith. A rational jury could have found that the Defendant retreated the first time when he pepper-sprayed Mr. Smith, who was holding him at gunpoint and that the Defendant retreated a second time when as the Defendant was trying to escape, Mr. Smith shot him in the leg, which prompted the Defendant to fire several shots at Mr. Smith. Because the trial court's instruction could have left the jury with the impression that, since the Defendant was acting unlawfully and was in a place he did not have a right to be, the Defendant did not have a right to self-defense, we conclude that the instruction constitutes a non-structural constitutional error.

We reiterate that "[t]he existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). Moreover, "'[i]n order to determine whether an instructional error is harmless, the appellate court must ask whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Perrier, 536 S.W.3d at 404 n.8 (quoting Cecil, 409 S.W.3d at 610). Here, the State has failed to demonstrate beyond a reasonable doubt that the instructional error in this case was harmless. Under these facts, a rational jury could have found that the Defendant first retreated before using force intended or likely to cause death or serious bodily injury when he had a reasonable belief that there was an imminent danger of death or serious bodily injury, that the danger creating the belief of imminent death or serious bodily injury was real, and that the belief of danger was founded upon reasonable grounds. See Tenn. Code Ann. § 39-11-611(b)(2) (Supp. 2017); see also Perrier, 536 S.W.3d at 405; Chambers, 2020 WL 1493940, at *16. Because the State has failed to demonstrate beyond a reasonable doubt that the instructional error in this case was harmless, we reverse the Defendant's convictions and remand the case for a new trial.

This case highlights the need for clarification in the pattern jury instruction on self-defense to eliminate confusion on the charge when the trial court determines in accordance with Perrier that the State has produced clear and convincing evidence that a defendant was engaged in unlawful activity or that a defendant was in a place where he or she did not have a right to be. To avoid confusion, the Committee might consider providing separate pattern jury instructions for self-defense where (1) the defendant had no duty to retreat and (2) the defendant had a duty to retreat because the defendant was engaged in unlawful activity or was in a place he did not have a right to be. The following language is consistent with jury instructions upheld by this court when a defendant has a duty to retreat:

> The defendant had a duty to retreat before [threatening][using] force against the [deceased][alleged victim]. A duty to retreat requires the defendant to employ all means in his power, consistent with his own safety, to avoid

danger and to avert the necessity of taking another's life. This requirement includes the duty to retreat, if, and to the extent, that it can be done in safety.

## CONCLUSION

The self-defense instruction was error and this error was not harmless beyond a reasonable doubt given the particular facts of this case. Accordingly, we reverse each of the Defendant's convictions, including the violation of the order of protection for continuity, and remand this case to the trial court for a new trial on all counts.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE